IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| PATRICIA A. GORRELL,<br>  Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil No. 3:18cv538 (MHL) |
| ANDREW M. SAUL,[1]<br>Commissioner of Social Security,<br>  Defendant. | )<br>)<br>)<br>) | |

REPORT AND RECOMMENDATION

On January 13, 2015, Patricia A. Gorrell ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act ("Act"), alleging disability from arthritis, high cholesterol, left shoulder surgery, two left

knee surgeries, surgery to remove a mass from her chest and screws in her right ankle, with an

alleged onset date of July 20, 2013. The Social Security Administration ("SSA") denied

Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law

Judge ("ALJ") declared Plaintiff disabled under the Act in a written decision. Upon review, the

Appeals Council reversed the ALJ's decision, rendering the Appeals Council's decision as the

final decision of the Commissioner.

Plaintiff now seeks judicial review of the Appeals Council's decision pursuant to 42

U.S.C. § 405(g), arguing that the Appeals Council erred by: (1) assigning limited weight to the

---

[1]    On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

medical opinions of Peter Wishnie, D.P.M., and Euton Laing, M.D.; (2) finding Plaintiff's

statements regarding the intensity, persistence and limiting effects of her symptoms only

partially credible; and, (3) relying on the Vocational Expert's ("VE") response to an incomplete

hypothetical to determine that Plaintiff could perform her past relevant work.  (Mem. in Supp. of

Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13-1) at 1.)  This matter now comes before the

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties'

cross-motions for summary judgment, rendering the matter ripe for review.[2]  For the reasons that

follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be

GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED and

that the final decision of the Commissioner be VACATED and REMANDED pursuant to the

fourth sentence of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

On January 13, 2015, Plaintiff filed applications for DIB and SSI with an alleged onset

date of July 20, 2013.  (R. at 189, 210.)  The SSA denied these claims initially on June 3, 2015,

and again upon reconsideration on October 27, 2015.  (R. at 67-68, 97-98.)  At Plaintiff's written

request, the ALJ held a hearing on July 24, 2017.  (R. at 24-42, 118-19.)  On August 24, 2017,

the ALJ issued a written opinion, finding that Plaintiff qualified as disabled under the Act.  (R. at

16-23.)  On June 5, 2018, the Appeals Council issued a written opinion, adopting some of the

ALJ's findings, but ultimately concluding that Plaintiff did not qualify as disabled under the Act.

---

[2]       The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

(R. at 5-10.) Thus, the Appeals Council's decision constitutes the final decision of the Commissioner subject to review by this Court.

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the [SSA's] disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v.*

3

*Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings.  *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the Commissioner's determination or if the ALC or Appeals Council made an error of law, the court must reverse the decision.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation).  To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations.  §§ 404.1545(a), 416.945(a).  At step four, the ALJ assesses whether the claimant can perform her past work given her RFC.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

A claimant may request that the Appeals Council review the ALJ's decision, or the Appeals Council may initiate its own review of the ALJ's action anytime within sixty days after

4

the ALJ issued his decision. 20 C.F.R. §§ 404.968, 404.969, 416.1468, 416.1469. The Appeals

Council will review a case if the ALJ's decision contains an error of law or lacks support from

substantial evidence, 20 C.F.R. §§ 404.970, 416.1470, and the Appeals Council "may affirm,

modify or reverse" the ALJ's decision, 20 C.F.R. §§ 404.979, 416.1479. When the Appeals

Council makes a decision and issues its own opinion, courts must likewise uphold the Appeals

Council's decision if it is supported by substantial evidence and "reached through the application

of the correct legal standard." *Meyer v. Astrue*, 662 F.3d 700, 705-06 (4th Cir. 2011) (quoting

*Craig*, 76 F.3d at 589); *Lovejoy v. Heckler*, 790 F.2d 1114, 1116 (4th Cir. 1986).

### III.   THE ALJ'S DECISION

On July 24, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel)

and a vocational expert ("VE") testified. (R. at 24-42.) On August 25, 2017, the ALJ issued a

written opinion, finding that Plaintiff qualified as disabled under the Act. (R. at 13-23.)

The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim. (R. at 13-23.) At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since July 20, 2013. (R. at 19.) At step two, the

ALJ found that Plaintiff had the following severe impairments: status-post superior mediastinal

mass removal, bilateral arthritis of the knees, osteoarthritis of the right ankle and foot, status-post

internal fixation, obesity and status-post rotator cuff tear. (R. at 19.) At step three, the ALJ

found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (R. at 19.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work

with additional limitations. Specifically, Plaintiff could occasionally climb ramps and stairs,

occasionally stoop, crouch, balance and crawl, never kneel and never climb ladders, ropes or

scaffolds. (R. at 20.) Plaintiff could occasionally reach overhead with the right upper extremity,

occasionally push and pull controls with her upper and lower extremities, tolerate moderate noise

and frequently handle and finger. (R. at 20.) The ALJ further assessed that Plaintiff could have

no exposure to extremes in environmental conditions or concentrated pulmonary irritants, and

Plaintiff required a cane to ambulate. (R. at 20.)

At step four, the ALJ found that Plaintiff could not perform her past relevant work. (R. at

22.) At step five, the ALJ determined that Plaintiff could not perform jobs existing in significant

numbers in the national economy. (R. at 22.) Therefore, the ALJ concluded that Plaintiff

qualified as disabled under the Act. (R. at 22-23.)

### IV.   THE APPEALS COUNCIL'S DECISION

On June 5, 2018, the Appeals Council issued a written opinion, setting aside the ALJ's

favorable decision. (R. at 2-15.) The Appeals Council identified two errors in the ALJ's

opinion. (R. at 6-8.) First, the Appeals Council disagreed with the ALJ's finding that Plaintiff

fulfilled the insured status requirements of §§ 216(i) and 223 of the Act through March 31, 2025.

(R. at 6, 19.) After reviewing Plaintiff's earnings records, the Appeals Council found that

Plaintiff satisfied the insured status requirements through June 30, 2019. (R. at 6.)

Next, the Appeals Council disagreed with the ALJ's finding that Plaintiff could not

perform her past relevant work. (R. at 7-8, 22.) The Appeals Council explained that Plaintiff's

previous employment as a customer service representative constituted past relevant work,

because her earnings records demonstrated that Plaintiff performed the work in the last fifteen

years, and she performed the work "long enough to learn how to do it and the earnings were

consistent with substantial gainful activity levels." (R. at 7 (citing 20 C.F.R. §§ 404.1565,

6

416.965).) During the hearing before the ALJ, the VE testified that a hypothetical individual with the same age, education, work experience and RFC as Plaintiff could perform work as a customer service representative. (R. at 39-40.) Because the ALJ "offered no rationale for rejecting the [VE's] opinion" that Plaintiff could perform her past relevant work as a customer service representative, the Appeals Council held that substantial evidence did not support the ALJ's finding at step four or the ALJ's finding that Plaintiff qualified as disabled under the Act. (R. at 8.)

After reviewing the entire record, the Appeals Council made the same findings as the ALJ at steps one, two and three of the sequential analysis. (R. at 6, 19.) The Appeals Council also adopted the same RFC as assessed by the ALJ. (R. at 7, 20.) At step four, the Appeals Council found that Plaintiff could perform her past relevant work as a customer service representative; thus, Plaintiff did not qualify as disabled under the Act. (R. at 10.)

## V.    ANALYSIS

Plaintiff, age sixty at the time of this Report and Recommendation, previously worked as a customer service representative. (R. at 7, 215.) She applied for Social Security Benefits, alleging disability from arthritis, high cholesterol, left shoulder surgery, two left knee surgeries, surgery to remove a mass from her chest and screws in her right ankle, with an alleged onset date of July 23, 2013. (R. at 213.) Plaintiff's appeal to this Court alleges that the Appeals Council erred by: (1) assigning limited weight to the medical opinions of Dr. Wishnie and Dr. Laing; (2) finding Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms only partially credible; and, (3) relying on the VE's response to an incomplete hypothetical to determine that Plaintiff could perform her past relevant work. (Pl.'s Mem. at 1.) For the reasons set forth below, the Appeals Council erred in its decision.

7

A.      **The Appeals Council Did Not Err in Assessing Dr. Wishnie's and Dr. Laing's Opinions.**

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[3] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a),

---

[3]      Effective March 27, 2017, the SSA rescinded SSR 96-2p and SSR 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claims on January 13, 2013, before this regulation took effect. (R. at 189, 213.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-3p applies to Plaintiff's claims.

416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-3p; §§ 404.1527(f), 416.927(f).[4] Under the applicable regulations and caselaw, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858,867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. §§ 404.1527(c), 416.927(c). However, those

---

[4]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). The given examples are a non-exhaustive list. SSR 06-3p.

same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-3p.

When the Appeals Council makes a decision and issues its own opinion, as it did here, it must follow the same rules for considering opinion evidence as the ALJ. *Meyer*, 662 F.3d at 705-06; *see* §§ 404.1513a(c), 416.913a(c) (instructing Appeals Council to evaluate prior administrative medical findings according to same rules that ALJ must follow).

### 1. Dr. Laing's Opinion.

Plaintiff argues that the Appeals Council erred in affording Dr. Laing's opinion limited weight, because Dr. Laing's opinion comports with treatment records regarding osteoarthritis in Plaintiff's knees. (Pl.'s Mem. at 10-11.) Defendant responds that substantial evidence supports the Appeals Council's decision to afford limited weight to Dr. Laing's opinion. (Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 14) at 21-24.)

On February 15, 2015, Dr. Laing completed a medical source statement. (R. at 555-57.) Dr. Laing noted that Plaintiff experienced pain and a decreased range of motion in her right shoulder and both knees, as well as chest wall tenderness. (R. at 555.) Based on these findings and his treatment of Plaintiff, Dr. Laing opined that Plaintiff's impairments would last at least twelve months. (R. at 555.) Dr. Laing indicated that Plaintiff did not need an assistive walking device while occasionally standing or walking, and he opined that Plaintiff could stand or walk for up to two hours and sit for four hours during an eight-hour workday with normal breaks and the ability to shift between sitting, standing and walking at will. (R. at 555-56.) Dr. Laing

further opined that Plaintiff could rarely lift less than ten pounds, never lift twenty pounds, rarely twist and climb stairs, and never stoop, bend, crouch, squat or climb ladders. (R. at 556.) Dr. Laing found that Plaintiff had significant limitations in reaching, and he estimated that Plaintiff could reach (including reaching overhead) 10 percent of the time, use her hands to grasp, turn and twist objects 50 percent of the time and use her fingers for fine manipulations 100 percent of the time. (R. at 556.) Dr. Laing opined that Plaintiff's pain and other symptoms would frequently interfere with the attention and concentration needed to perform simple work tasks and cause her to miss approximately three days of work per month. (R. at 557.) However, Dr. Laing believed that Plaintiff could tolerate low stress jobs. (R. at 557.)

The ALJ afforded Dr. Laing's opinion great weight, because it comported with the record. (R. at 21-22.) The ALJ credited Dr. Laing's "firsthand exposure to and longitudinal understanding of . . . [Plaintiff's] functional abilities." (R. at 22.) The ALJ found that Plaintiff's history of invasive treatment and lack of overall improvement supported Dr. Laing's opinion. (R. at 22.)

The Appeals Council, on the other hand, afforded Dr. Laing's opinion limited weight, because his suggested limitations did not comport with clinical examinations showing that Plaintiff retained a greater capacity to sit, lift, carry, perform postural and manipulative activities and maintain attendance on a regular and continuing basis. (R. at 9.) In accordance with the regulations, the Appeals Council appropriately cited to the lack of support and consistency between Dr. Laing's opinion and Plaintiff's medical records, §§ 404.1527(c), 416.927(c), and substantial evidence supports the Appeals Council's decision.

First, Dr. Laing's own treatment notes do not support the limitations that he endorsed. On December 13, 2013, Plaintiff presented to Dr. Laing at Premier Family Physicians,

11

complaining of bruising and pain following shoulder surgery.  (R. at 639.)  Despite experiencing pain and slight tenderness to palpation on her left shoulder, Plaintiff demonstrated normal strength in all muscle groups and a normal range of motion in all joints.  (R. at 640.)  Dr. Laing instructed Plaintiff to use a heating pad on her left shoulder.  (R. at 640.)  On October 31, 2014, Plaintiff returned to Dr. Laing, complaining of a painful left lump on her knee.  (R. at 574.)  Dr. Laing observed tenderness with palpation on Plaintiff's left knee, but his physical examination revealed otherwise unremarkable results.  (R. at 575-76.)

On January 21, 2015, Plaintiff presented to Dr. Laing, complaining of dizziness, but she denied experiencing headaches, poor balance, difficulty with concentration or memory loss.  (R. 578.)  On examination, Plaintiff displayed grossly intact cranial nerves, normal motor strength in all extremities and no focal neurological deficits.  (R. at 579.)  Plaintiff also displayed normal strength in all muscle groups and a normal range of motion in all joints.  (R. at 579.)  On February 11, 2015, Plaintiff returned to Dr. Laing, complaining of pain in her right knee and chest.  (R. at 581.)  Dr. Laing's physical examination again revealed unremarkable results.  (R. at 583.)  Plaintiff displayed normal muscle strength in all muscle groups and a normal range of motion in her joints.  (R. at 583.)  Plaintiff also had a normal heartrate and rhythm and her respiratory system appeared clear.  (R. at 583.)

Dr. Laing next saw Plaintiff on April 2 and August 21, 2015, regarding her blood-pressure, and he did not make any remarkable findings on physical examination.  (R. at 659-663.)  Plaintiff returned to Dr. Laing on October 14, 2015, for a follow-up examination to discuss a magnetic resonance imaging ("MRI") of her brain and her vertigo.  (R. at 686.)  Again, Dr. Laing made no remarkable findings on physical examination.  (R. at 688.)  On November 6, 2015, Plaintiff complained of right hand pain and knee pain, but Dr. Laing observed no joint

effusions, muscle masses, clubbing, cyanosis or edema in Plaintiff's extremities. (R. at 690-92.) Ultimately, Dr. Laing's findings of normal muscle strength and range of motion in Plaintiff's joints, (R. at 583, 640), normal motor strength and intact cranial nerves, (R. at 579), and otherwise unremarkable treatment notes do not support his work-preclusive opinion, (R. at 557).

The remainder of Plaintiff's treatment records likewise reveal that she retained a greater functional capacity than Dr. Laing opined. On May 27, 2013, Plaintiff presented to the emergency department at St. Peter's University Hospital, complaining of chest pain. (R. at 319.) An x-ray and computed tomography ("CT") scan of Plaintiff's chest revealed a mediastinal mass, but Plaintiff had clear lungs and a normal heart size. (R. at 337-39.) The hospital discharged Plaintiff once her condition improved later that day. (R. at 322, 326.) On July 25, 2013, Plaintiff returned to St. Peter's University Hospital to have the mediastinal mass in her chest excised. (R. at 347.) Robert Caccavale, M.D., performed the procedure and reported no complications. (R. at 351.)

On August 27, 2013, Plaintiff presented to Deepak K. Jain, M.D., complaining that she experienced right arm pain and left shoulder pain since her chest surgery. (R. at 426.) Plaintiff displayed a decreased range of motion in her left upper extremities, but she had normal strength and tone. (R. at 427.) Dr. Jain diagnosed Plaintiff with shoulder pain. (R. at 427.)

Plaintiff underwent a left shoulder arthroscopy at the John F. Kennedy Medical Center on December 3, 2013. (R. at 534.) Nader Q. Kasim, M.D., performed the procedure and noted no complications. (R. at 534.) Following her surgery, Plaintiff attended physical therapy sessions at Twin Boro Physical Therapy from December 2013 through February 2014. (R. at 449-512.) On January 27, 2014, Plaintiff reported that she could lift light objects from the floor to her waist, but she could not lift anything overhead. (R. at 485.) Plaintiff noted that her ability to

dress and maintain personal hygiene had significantly improved, although she could not reach

behind her back to wash herself.  (R. at 487.)  Although Plaintiff continued to experience a

decreased range of motion in her left shoulder and struggled with lifting or carrying items

overhead, Mary Ann Bock, P.T., noted that Plaintiff continued to demonstrate a positive

response to physical therapy.  (R. at 487.)  During her last visit in January 2014, Plaintiff could

still not reach behind her back, but she reported "moving better" and estimated that she would

return to work and avoid overhead lifting.  (R. at 493.)  In February 2014, Plaintiff's range of

motion, strength and function improved, (R. at 496, 499, 507, 511), and she improved her ability

to reach her arms overhead without any weight, (R. at 505).

On March 5, 2014, Plaintiff presented to Dr. Kasim at the Advanced Orthopedics &

Sports Medicine Center for a follow-up appointment.  (R. at 554.)  Plaintiff reported improved

function and improved shoulder pain, but she complained of intermittent left knee pain.  (R. at

551.)  She appeared alert and oriented and in no acute distress.  (R. at 554.)  On examination, Dr.

Kasim noted that Plaintiff displayed improved motion in her left shoulder with mild stiffness and

weakness.  (R. at 554.)  Dr. Kasim further observed that Plaintiff had "good motion" in her left

knee, but he noted "some crepitus located medially and laterally."  (R. at 554.)  Dr. Kasim

assessed Plaintiff as having left shoulder arthroscopy and left knee pain.  (R. at 554.)  To treat

Plaintiff's knee, Dr. Kasim instructed Plaintiff to perform exercises on her own and he prescribed

another round of physical therapy to treat Plaintiff's shoulder.  (R. at 554.)

On November 10, 2014, Plaintiff returned to Dr. Kasim, complaining of continued left

knee pain.  (R. at 552.)  Because x-rays had shown only mild arthritis, Dr. Kasim recommended

that Plaintiff undergo an MRI, because he believed Plaintiff had a torn meniscus.  (R. at 552.)

As Dr. Kasim predicted, Plaintiff's MRI revealed obvious tearing of the meniscus medially.  (R.

14

at 549-51.)  Plaintiff also had a large cyst underneath the patellar tendon.  (R. at 549.)  On
December 9, 2014, Plaintiff underwent a left knee arthroscopy.  (R. at 519.)  Dr. Kasim
performed the procedure and reported no complications.  (R. at 519.)

On December 15, 2014, Plaintiff returned to Dr. Kasim for a follow-up appointment.  (R.
at 545.)  Plaintiff reported improvement in her left knee, but she complained of pain and
"clicking and popping" in the right knee.  (R. at 545.)  On examination, Dr. Kasim observed that
Plaintiff's left knee wounds had healed and she had good motion with mild swelling.  (R. at 545.)
Dr. Kasim observed crepitus and tenderness medially and laterally in Plaintiff's right knee.  (R.
at 545.)  Dr. Kasim assessed Plaintiff as having left knee arthroscopy and possible cartilage
damage in the right knee.  (R. at 545.)

On January 26, 2015, Dr. Kasim observed further improvement in Plaintiff's left knee,
but Plaintiff complained of continued pain in her right knee that worsened with twisting or
pivoting.  (R. at 544.)  Dr. Kasim instructed Plaintiff to finish physical therapy for her left knee
and to perform exercises and modalities for her right knee.  (R. at 545.)  X-rays of Plaintiff's
right knee taken on February 12, 2015, revealed enthesophyte of the anterior patella.  (R. at 586.)

On March 9, 2015, Plaintiff presented to David Abrutyn, M.D., for evaluation of her right
knee and reported difficulty going up and down stairs.  (R. at 594-95.)  On examination, Dr.
Abrutyn observed no significant effusion and mild patellofemoral crepitus, and he diagnosed
Plaintiff with mild degenerative joint disease with internal derangement.  (R. at 595.)  Plaintiff
received a corticosteroid injection in her right knee.  (R. at 595.)  Dr. Abrutyn observed no
conditions that would limit Plaintiff's ability to perform work-related activities.  (R. at 591.)

On March 24, 2015, Plaintiff presented to the emergency department of Robert Wood
Johnson University Hospital, complaining of chest pain.  (R. at 618.)  X-rays of Plaintiff's chest

revealed no acute cardiopulmonary disease. (R. at 624.)  Chirag Hasmukh Shah, D.O.,

performed a cardiology consultation and diagnosed Plaintiff as suffering from atypical chest

pain, likely hypertensive heart disease and obesity. (R. at 618.)  Dr. Shah noted that Plaintiff's

electrocardiogram ("EKG") showed normal sinus rhythm and he recommended that Plaintiff

better control her blood pressure. (R. at 618.)  The hospital discharged Plaintiff on March 26,

2015. (R. at 620.)

Plaintiff returned to Dr. Abrutyn on March 23, 2015, reporting minimal relief from the

steroid injection that she had received earlier that month and continued pain in her right knee.

(R. at 596-98.)  On May 15, 2015, Dr. Abrutyn noted that Plaintiff's MRI showed a tear

involving the medial and lateral meniscus, mild articular cartilage changes and a parameniscal

cyst in her right knee. (R. at 673; *see* R. at 647-48 (April 2015 MRI).)  Plaintiff complained of

continued pain in both her knees. (R. at 673.)  On examination, Plaintiff's exhibited tenderness

in her left knee and mild patellofemoral crepitus. (R. at 673.)  Dr. Abutryn aspirated Plaintiff's

left knee and injected it with lidocaine to relieve her swelling. (R. at 673.)

On October 8, 2015, Plaintiff presented to Betty Vehkins, M.D., for an orthopedic

examination. (R. at 667.)  Dr. Vehkins discussed Plaintiff's obesity and surgical history. (R. at

667.)  Dr. Vehkins observed Plaintiff walk into the office using a straight cane, but stated that

Plaintiff could walk without an assistive device. (R. at 667.)  Plaintiff did not walk on her heels

and toes, and she could squat shallow. (R. at 667.)  Plaintiff displayed no spinal tenderness and

she displayed a full range of motion in her shoulders, elbows and wrists. (R. at 668.)  Plaintiff

had normal grip strength and a normal sensory examination. (R. at 668.)  In her lower

extremities, Plaintiff had a functional range of motion in her hips, right knee and ankles and no

sensory loss, but Plaintiff had mild tenderness in her left knee and mild swelling in her right

ankle. (R. at 668.) Dr. Vehkins assessed that Plaintiff had normal functions of her hands for fine and gross motor manipulations and that she could walk without an assistive device, but used her cane during inclement weather. (R. at 668.)

On October 21, 2015, Plaintiff presented to the Robert Wood Johnson University Hospital for a comprehensive audiologic evaluation in response to Plaintiff's complaints of dizziness and her reported episodes of vertigo. (R. at 681.) The evaluation revealed that Plaintiff had normal hearing sensitivity bilaterally, normal middle ear function and excellent word recognition. (R. at 681.)

On January 17, 2016, Plaintiff presented to the emergency department at St. Peter's University Hospital, complaining of a cough. (R. at 723.) Plaintiff arrived to the hospital ambulatory and, on physical examination, she appeared alert and oriented, displayed no motor sensory deficits, no tenderness in her extremities and she displayed a full range of motion in all extremities. (R. at 726.) Treating staff diagnosed Plaintiff with acute bronchitis and wheezing, prescribed medication to her and discharged her that same day in an improved condition. (R. at 727-30.)

On July 22, 2015, Plaintiff returned to the emergency department at St. Peter's University Hospital after striking her foot on a coffee table and sustaining a soft tissue injury. (R. at 735, 738.) On physical examination, Plaintiff displayed a full range of motion in all extremities and no muscle weakness, (R. at 737), but Plaintiff experienced moderate tenderness on the third right toe and had a slight deformity, (R. at 739). Treating staff diagnosed Plaintiff with a closed fracture on the her third prixmal pahanax (toe), prescribed Oxycodone and discharged Plaintiff in stable condition. (R. at 740, 750.) Hospital staff provided Plaintiff with a cane to use in the emergency room, (R. at 738), but Plaintiff left the hospital with a steady gait, (R. at 740).

In August and September 2015, Plaintiff presented to John Mostafa, D.P.M., at New Jersey Foot & Ankle Associates for evaluation of her toe fracture. (R. at 807-20.) During each visit, Plaintiff reported improvement in her condition and less pain, and she walked with a normal gait without any assistive devices. (R. at 807, 811, 815-16.) On September 29, 2015, Dr. Mostafa observed a significant reduction in swelling of Plaintiff's second and third toes on her right foot. (R. at 807.) Plaintiff also demonstrated normal strength and range of motion in her right foot. (R. at 807.) Although Plaintiff did not exhibit full reflexes in her right ankle, she experienced normal sensation. (R. at 807-08.) Dr. Mostafa fitted Plaintiff with a pair of custom molded orthotics and advised her to wear them for one hour per day until she could tolerate a full eight-hour day. (R. at 809.)

Plaintiff presented to the emergency department at St. Peter's University Hospital on February 7, 2016, complaining of wheezing. (R. at 714.) On physical examination, Plaintiff had full range of motion in all extremities and no muscle weakness or other musculoskeletal deficits. (R. at 716-17.) X-rays of Plaintiff's chest revealed unremarkable results. (R. at 718.) Treating staff diagnosed Plaintiff with acute bronchitis and discharged her home with medication that same day. (R. at 718.)

On March 18, 2016, Plaintiff presented to Jeffrey Bechler, M.D., at University Orthopedics Associates ("UOA"), complaining of throbbing pain and swelling in her right knee. (R. at 840.) Although Plaintiff experienced tenderness to palpation in her knees, she walked with a normal gait, demonstrated a pain-free active and passive range of motion in both knees, as well as normal muscle strength and reflexes. (R. at 841-42.) Dr. Bechler opined that Plaintiff's arthritis in both knees caused her persistent symptoms. (R. at 842.) Plaintiff returned to Dr. Belcher on April 8, 2016, complaining of left knee pain. (R. at 839.) Dr. Bechler observed mild

tenderness in Plaintiff's left knee, but observed no effusion or change in the range of motion in Plaintiff's left knee.  (R. at 839.)

On April 15, 2016, Plaintiff presented to Barbara Etheridge, M.D., complaining of right hand pain and stiffness.  (R. at 778.)  Dr. Etheridge observed tenderness over Plaintiff's fourth metacarpophalangeal joint, diagnosed Plaintiff with trigger finger on her right ring finger and instructed Plaintiff to continue with her current medication regimen.  (R. at 779.)  Plaintiff presented to James Monica, M.D., at UOA on April 25, 2016, again complaining of pain, stiffness and swelling in her right hand.  (R. at 838.)  Dr. Monica noted that Plaintiff had intact sensation throughout her right hand, but she experienced tenderness and active triggering in her right ring finger.  (R. at 838.)  Dr. Monica aspirated Plaintiff's right ring finger and injected it with lidocaine.  (R. at 838.)  On May 3, 2016, Plaintiff returned to Dr. Bechler for an Orthovisc injection into her left knee.  (R. at 837.)  Dr. Bechler noted that Plaintiff had a decreased range of motion in her left knee, but no effusion.  (R. at 837.)  Plaintiff received two more Orthovisc injections in May 2016.  (R. at 835-36.)

On June 14, 2016, Plaintiff presented to the emergency department at St. Peter's University Hospital after she cut herself on something in the garbage can and sustained a laceration on her left foot.  (R. at 704-05.)  Plaintiff appeared awake and alert with clear speech. (R. at 706.)  Although Plaintiff experienced "quite uncomfortable pain," she had no significant tenderness, swelling or discoloration in her left ankle.  (R. at 706.)  Plaintiff's left foot and ankle appeared normal, and she displayed a full range of motion in all extremities with no muscle weakness.  (R. at 706.)  Treating staff sutured Plaintiff's wound, administered an updated tetanus shot and discharged her home in stable condition that same day.  (R. at 708, 713.)

19

On July 12, 2016, Plaintiff returned to Dr. Bechler, complaining of continued left knee pain. (R. at 834.) Plaintiff reported that the Orthovisc injections provided about 60 percent relief for two weeks, but her pain returned. (R. at 834.) Prolonged walking and standing exacerbated Plaintiff's pain. (R. at 834.) Dr. Bechler prescribed Celebrex to treat Plaintiff's pain and had a preliminary discussion with Plaintiff about knee replacement surgery. (R. at 834.)

On September 7, 2016, Plaintiff presented to Dr. Etheridge complaining of knee pain. (R. at 760.) Dr. Etheridge noted that Plaintiff walked with an abnormal gait due to pain. (R. at 760.) Plaintiff stated that Tramadol "help[ed] take the edge off" and that she needed pain medication to hold her over until her next appointment. (R. at 760.) On physical examination, Dr. Etheridge noted tenderness in Plaintiff's bilateral knees, but no edema or calf tenderness. (R. at 761.) Dr. Etheridge instructed Plaintiff to continue with her current medication and refilled Plaintiff's prescription for Tramadol. (R. at 762.) Plaintiff returned to Dr. Bechler on September 16, 2016, and reported that physical therapy exacerbated her knee pain. (R. at 832.) Dr. Bechler administered three Orthovisc injections into Plaintiff's right knee between October and November 2016. (R. at 829-31.)

On March 28, 2017, Plaintiff presented to Robert Zanella, D.P.M., at New Jersey Foot & Ankle Associates, complaining of bilateral ankle pain. (R. at 799.) Plaintiff reported to Dr. Zanella that she had a part-time cleaning job and could "hardly walk to her car" due to pain at the end of the day. (R. at 800.) Dr. Zanella noted that Plaintiff walked with a limp. (R. at 800.) On physical examination, Plaintiff had normal muscle strength, but she had swelling and a reduced range of motion in both ankles. (R. at 800.) Dr. Zanella administered a cortisone injection into Plaintiff's right ankle and instructed Plaintiff to avoid strenuous activity for twenty-four to forty-eight hours, ice her ankles and take Tylenol for pain as needed. (R. at 801.)

Plaintiff returned to Dr. Zanella in April 2017 for a follow-up appointment. (R. at 792-94.) An ultrasound of Plaintiff's ankle revealed a possible ganglion tumor or nerve sheath tumor. (R. at 794.) Dr. Zanella recommended that Plaintiff undergo an MRI and brace her ankle, which he noted had provided Plaintiff some relief in the past. (R. at 794.)

On May 17, 2017, Plaintiff presented to Denise Bonnin, D.P.M., at Family Foot & Ankle Specialists, complaining of bilateral ankle pain. (R. at 857-59.) Dr. Bonnin observed that Plaintiff walked with a normal gait and demonstrated normal strength and range of motion in both of her ankles. (R. at 858.) Plaintiff also displayed grossly intact sensation in her feet. (R. at 858.) Dr. Bonnin diagnosed Plaintiff with plantar fascial fibromatosis, posterior tibial tendinitis in the right leg and post-traumatic osteoarthritis in the right foot and ankle. (R. at 858.)

On May 22, 2017, Plaintiff presented to Dr. Kasim, complaining of inflammation in her left knee and arthritis in her right knee. (R. at 823.) Dr. Kasim noted that Plaintiff limped when she walked, and he observed crepitus and stiffness in Plaintiff's left knee, but no effusion. (R. at 823.) On Plaintiff's right knee, Dr. Kasim observed mild crepitus and mild tenderness medially. (R. at 823.) Dr. Kasim administered a cortisone injection in Plaintiff's left knee and recommended exercises to improve Plaintiff's right knee pain. (R. at 823.)

On May 25, 2017, Plaintiff presented to Dr. Wishnie at Family Foot & Ankle Specialists, complaining of bilateral ankle pain. (R. at 851-53.) Dr. Wishnie observed a severe pop along the right tibia-fibular joint, but noted that Plaintiff had normal strength and range of motion in both ankles. (R. at 852.) Dr. Wishnie also noted that Plaintiff walked with a normal gait and had grossly intact sensation in her feet. (R. at 852.) Dr. Wishnie diagnosed Plaintiff with synovitis and tenosynovitis, a sprain of the tibiofibular ligament in the right ankle, right foot pain and difficulty walking. (R. at 853.) Dr. Wishnie made identical findings when he examined Plaintiff

again on June 27, 2017, and he administered a lidocaine injection in attempts to alleviate
Plaintiff's ankle pain. (R. at 848-49.)

Plaintiff cites to treatment records relating to her knee problems as evidence supporting
the work-preclusive limitations that Dr. Laing endorsed. (Pl.'s Mem. at 10 (citing R. at 823, 834,
839, 840-44).) But the longitudinal records demonstrate that, despite Plaintiff's impairments and
continued complaints of pain, she often retained normal strength, (R. at 427, 737, 842, 807-08,
800, 858), and a normal range of motion, (R. at 737, 842, 807-08, 858). Although Plaintiff
reported difficulty with prolonged walking and standing to Dr. Bechler in July 2016, and Dr.
Bechler suggested that Plaintiff may require knee replacement surgery, (R. at 834), Plaintiff's
most recent treatment records reflect that she walked with a normal gait in May and June 2017,
(R. at 848, 852, 858).

Dr. Laing also opined that Plaintiff's pain and other symptoms would frequently interfere
with the attention and concentration needed to perform simple work tasks, (R. at 557), but this
finding does not comport with treatment records reflecting that Plaintiff appeared alert and
oriented and maintained a calm and cooperative demeanor, even when she experienced pain. For
instance, when Plaintiff presented to the emergency room with a foot laceration in July 2015,
treating staff described her as calm, cooperative, alert and oriented, even though she appeared to
be in mild distress. (R. at 737-38; *see also* R. at 760-61 (appearing alert and oriented despite
knee pain), 807 (appearing active and alert with a normal mood and affect despite toe fracture
and foot swelling), 811 (same), 815 (same), 847-48 (appearing alert and no signs of acute
distress despite ankle pain), 851-52 (same), 857-58 (same).) These records constitute substantial
evidence supporting the Appeals Council's decision to afford Dr. Laing's opinion limited weight.

### 2.    *Dr. Wishnie's Opinion.*

Plaintiff argues that the Appeals Council erred in affording Dr. Wishnie's opinion limited

weight, because Dr. Wishnie's opinion comports with Plaintiff's history of right ankle and foot

impairments. (Pl.'s Mem. at 11-12.)  Defendant responds that substantial evidence supports the

Appeals Council's decision to afford limited weight to Dr. Wishnie's opinion. (Def.'s Mem. at

21-24.)

On November 6, 2017, Dr. Wishnie completed a RFC form. (R. at 882-87.)  Dr.

Wishnie listed Plaintiff's right ankle pain as the primary symptom rendering Plaintiff unable to

work and noted that Plaintiff had advanced osteoarthritis with degenerative changes in the bone

"past the point of surgery." (R. at 882.)  Dr. Wishnie also stated that Plaintiff lost complete

movement in her ankle, citing to the results of Plaintiff's x-rays, ultrasounds and MRIs. (R. at

882.)  Citing the progression of Plaintiff's osteoarthritis and degenerative changes, Dr. Wishnie

believed that Plaintiff would always require medication and that her condition would not

improve. (R. at 883.)  Dr. Wishnie opined that Plaintiff could sit upright for six to eight hours,

so long as she could elevate her leg, and that Plaintiff could sit for thirty minutes at one time. (R.

at 883.)  Dr. Wishnie also opined that Plaintiff had to lie down during the day due to her severe

pain and medications, which caused drowsiness. (R. at 884.)

Dr. Wishnie further opined that Plaintiff could walk no more than five minutes without

stopping. (R. at 884.)  He found that Plaintiff could consistently reach above her shoulders,

reach down to her waist, reach down towards the floor, carefully handle objects and handle with

her fingers when sitting. (R. at 884.)  Dr. Wishnie opined that Plaintiff could lift five to ten

pounds regularly during an eight-hour period and that Plaintiff could never squat or kneel, but

she could turn her upper body and had no limitations in bending. (R. at 884-85.)  Dr. Wishnie

23

believed that Plaintiff's impairments would prevent her from traveling alone, because she required assistance walking when her ankle pain flared up and swelled.  (R. at 885.)  Dr. Wishnie described Plaintiff's complaints of pain as "very" credible, and he cited to her history of ankle surgery and advanced osteoarthritis as medical evidence supporting her subjective complaints.  (R. at 886.)  Finally, Dr. Wishnie opined that Plaintiff could neither return to her previous work, nor perform other work.  (R. at 886.)

The ALJ did not consider Dr. Wishnie's opinion, because Dr. Wishnie completed the RFC assessment after the ALJ issued his opinion.  (R. at 23, 887.)  The Appeals Council afforded Dr. Wishnie's opinion limited weight, because it lacked consistency with Dr. Wishnie's own treatment records and the evidence as a whole.  (R. at 5.)  The Appeals Council noted that Dr. Wishnie's treatment records showed that Plaintiff walked with a normal gait and experienced minimal neuromuscular deficits, despite Plaintiff's complaints of foot pain.  (R. at 5.)  The Appeals Council also acknowledged that, aside from a June 2017 MRI showing "moderate to advanced osteoarthritis" and sychondral edema throughout Plaintiff's tibular joint, Dr. Wishnie's clinical examinations revealed no edema in the lower extremities or other neuromuscular deficits.  (R. at 5, 866.)  The Appeals Council also cited to medical records from June 2017 reflecting that Plaintiff walked with a normal gait, retained normal strength in all ankle areas, displayed intact reflexes and sensation, and demonstrated a full range of motion in the dorsiflexion and plantar flexion without pain in both her ankles.  (R. at 5-6.)  In assigning Dr. Wishnie's opinion little weight, the Appeals Council appropriately relied on the regulatory factors, including the supportability and consistency between the opinion and the medical records.  §§ 404.1527(c), 416.927(c).  Further, substantial evidence supports the Appeals Council's assignment of weight.

Plaintiff argues that treatment records regarding her ankle and foot impairments support Dr. Wishnie's opinion. (Pl.'s Mem. at 11-12 (citing R. at 794, 820, 852, 859).) First, Plaintiff cites to Dr. Mostafa's findings that Plaintiff had a toe fracture, a swollen limb, limb pain and congenital pes planus, (R. at 821; Pl.'s Mem. at 11), but Dr. Mostafa noted that Plaintiff's foot significantly improved after she fractured her toe in July 2017, and he noted that Plaintiff walked with a normal gait, had normal strength and active range of motion in her right ankle, (R. at 807, 811, 816). Next, Plaintiff points to treatment notes from 2017 showing that Plaintiff had a soft tissue tumor in her ankle and that she continued to experience pain and difficulty walking, (R. at 794, Pl.'s Mem. at 11-12), but, as the Appeals Council noted, treatment records from May and June 2017 — including Dr. Wishnie's own treatment notes — reflect that Plaintiff walked with a normal gait, despite her complaints of pain, (R. at 848, 852, 858). Although Dr. Wishnie observed a severe pop along the tib-fib joint in Plaintiff's right ankle, both Dr. Wishnie and Dr. Bonnin observed that Plaintiff had full strength and range of motion in both ankles and grossly intact sensation. (R. at 848, 852, 858.) Dr. Wishnie also assessed that Plaintiff would need to lie down during the day due to pain and drowsiness from medications, (R. at 884), but Plaintiff did not complain of this side effect during her appointments with Dr. Wishnie, (R. at 848, 852).

Lastly, Plaintiff argues that the Appeals Council erred by failing to recontact Dr. Wishnie to resolve any inconsistencies between his opinion and treatment records. (Pl.'s Mem. at 13-14.) Plaintiff suggests that the regulations require the SSA to recontact for clarification. (Pl.'s Mem. at 14 (citing §§ 404.1512(e)(1))). But the SSA eliminated the language requiring re-contact in March 2012. *Coleman v. Colvin*, 2016 WL 5372817, at *1 (M.D.N.C. Sept. 26, 2016) (citing 77 Fed. Reg. 10651-01, 2011 WL 7404303 (Feb. 23, 2012)). The revised regulations provide that the SSA "*may* recontact [a claimant's] medical source" and, the SSA "*may* choose not to seek

25

additional evidence or clarification from a medical source if [it] know[s] from experience that the source either cannot or will not provide the necessary evidence." 20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i) (emphasis added). Based on the permissive language of the regulations and the sufficiency of the record, which spanned over several years and included Dr. Wishnie's prior examinations and treatment notes, the Appeals Council did not err by failing to recontact Dr. Wishnie. Accordingly, substantial evidence supports the Appeals Council's decision to afford Dr. Wishnie's opinion limited weight.

## B. The Appeals Council Erred in Assessing Plaintiff's Credibility.

Plaintiff argues that the Appeals Council erred by failing to consider all of the regulatory factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms as set forth in § 404.1529(c)(3) and § 416.929(c)(3), by failing to explain which evidence it relied on in discounting Plaintiff's credibility and by basing its credibility determination solely on the objective medical evidence. (Pl.'s Mem. at 3-7); see §§ 404.1529(c)(2), 416.929(c)(2) (providing that the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements").) Defendant responds that substantial evidence supports the Appeals Council's credibility determination and any error committed by the Appeals Council in assessing Plaintiff's credibility proves harmless, because the Appeals Council ultimately adopted the same RFC assessed by the ALJ. (Def.'s Mem. at 18-21.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1). The RFC must

incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's consistent complaints. As of March 28, 2016, the ALJ must follow a revised two-step analysis in reviewing a claimant's subjective complaints. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); *see also* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) (correcting terminology relating to applicable date); SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date to March 28, 2016). The first step requires the ALJ to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 16-3p, 2016 WL 1119029, at *3. If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's "symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work[-]related activities." *Id.* at *4.

The ALJ's step-two evaluation must first consider the consistency between a claimant's statements and the objective medical evidence. *Id.* at *5. Unless the ALJ can determine that a claimant qualifies as disabled based solely on objective medical evidence, the ALJ must also consider other sources of evidence to determine consistency, including "statements from the [claimant], medical sources, and other sources that might have information about the [claimant's] symptoms." *Id.* at *5-7. Based on the degree of consistency between a claimant's statements and the evidence of record, the ALJ should find either a higher or lower likelihood that the claimant can perform work-related activities. *Id.* at *8.

Moreover, Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The

Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

During the hearing, Plaintiff testified that she experienced constant pain, which affected her ability to walk, and she stated that she always used a cane to ambulate. (R. at 33-34.) Plaintiff testified that her pain also affected her ability to drive, maintain concentration and perform activities of daily living, such as dressing herself and showering. (R. at 30-37.) Plaintiff stated that her severe pain rendered her unable to get out of bed for the entire day at least three times per week. (R. at 35.) She stated that her pain medication, which she took four times per day, caused her to feel drowsy or dizzy, and that she needed to lay down after taking it. (R. at 34-35.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, because Plaintiff's testimony comported with the medical evidence, opinion evidence and Plaintiff's long treatment history. (R. at 20-22.) In his opinion, the ALJ discussed Plaintiff's testimony regarding her inability to drive, difficulty walking and need to use a cane due to her impairments. (R. at 20.) The ALJ further noted that, although Plaintiff's medications reduced the intensity of her symptoms, they did not alleviate her symptoms and they caused her to feel dizzy and often required her to recline. (R. at 20.) Next, the ALJ stated that although Plaintiff could perform some activities of daily living, she required "an inordinate amount of time to complete them" and "need[ed] assistance at times to complete even simple tasks like showering depending on the intensity of her symptoms on a given day." (R. at 20.) Finally, the ALJ noted that Plaintiff had a long history of treatment and, despite

undergoing multiple surgeries, "[Plaintiff] continued to endorse symptoms of pain and functional loss[.]" (R. at 21.)

In contrast to the ALJ, the Appeals Council concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but it found that the record only partially supported Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms. (R. at 9.) The Appeals Council did not explicitly discuss the regulatory factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms, such as Plaintiff's daily activities, her response to treatment and the side effects of her medications, §§ 404.1529(c)(3), 416.929(c)(3), but the Appeals Council adopted the evidentiary facts set forth in the ALJ's opinion, which did discuss those factors. (R. at 6, 20-22.) However, this did not relieve the Appeals Council of its duty to explain its credibility findings, because the Appeals Council reached a different conclusion than the ALJ regarding Plaintiff's credibility. *See Davis v. Colvin*, 2015 WL 404213, at *11 (W.D.N.C. Jan. 29, 2015) (Appeals Council's failure to include credibility assessment in its decision did not require reversal, because Appeals Council adopted the ALJ's sufficient credibility finding). When an Appeals Council rejects an ALJ's credibility assessment, the Appeals Council "should explain its reasons for rejecting such findings." *Parker v. Bowen*, 788 F.2d 1512, 1520 (11th Cir. 1986); *see Laughlin v. Colvin*, 2014 WL 3738562, at *6 (E.D.N.C. July 29, 2014) (citing *Parker*, 788 F.2d at 1520, for the proposition that the Appeals Council must articulate its reasons for rejecting an ALJ's credibility findings); *see also Meyer*, 662 F.3d at 706 (noting that Appeals Council must explain its reasoning when it makes a decision and issues its own opinion); *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984) ("The Secretary may not ignore entirely evidence of pain which the ALJ has found credible." (citations omitted)).

Here, the Appeals Council stated that it considered Plaintiff's statements, her response to treatment, the medical evidence and the opinion evidence, and then summarily concluded that the record only partially supported Plaintiff's statements concerning the intensity, persistence and limiting effects of her pain. (R. at 9.) The Appeals Council did not go on to explain "what statements by [Plaintiff] undercut her subjective evidence of pain intensity as limiting her functional capacity." *Lewis*, 858 F.3d at 866. The Fourth Circuit has held that such a lack of explanation requires remand. *Id.* (citing *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling, including a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.") (additional citations and internal quotations omitted)).

The ALJ in *Lewis* found the plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms "not entirely credible, because the objective findings of [her] treating and examining sources [did] not support the severity of assessed restrictions that . . . [the plaintiff had] alleged." *Id.* at 864. The court remanded the ALJ's decision, because the ALJ failed to explain "what statements by [the plaintiff] undercut her subjective evidence of pain intensity as limiting her functional capacity," and because the ALJ improperly increased the plaintiff's burden of proof by requiring objective medical evidence to support Lewis's evidence of pain intensity. *Id.* at 866; *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (requiring remand, because ALJ failed to "'build an accurate and logical bridge from the evidence to his conclusion' that Monroe's testimony was not credible") (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

30

Similarly, here, the Appeals Council's opinion does not make clear what statements by Plaintiff undermined her testimony regarding the intensity, persistence and limiting effects of her pain. (R. at 6.) Although the Appeals Council referenced Plaintiff's testimony through its adoption of the ALJ's evidentiary facts and discussed the opinion evidence, it did not "highlight any inconsistencies between [P]laintiff's testimony and [her] complaints to [her] treating and consultative physicians," nor did the Appeals Council "discuss how plaintiff's daily activities rebut [her] subjective statements concerning [her] pain." *McIver v. Berryhill*, 2017 WL 6026614, at *3 (D. Md. Dec. 5, 2017) (remanding ALJ's decision so that ALJ could analyze and explain its credibility findings in accordance with *Lewis*, 858 F.3d at 866).

The Appeals Council's assignment of limited weight to the opinions of Drs. Wishnie and Laing suggests that it did not find Plaintiff's testimony regarding the side effects of her medication and the debilitating effects of her pain entirely credible, because their opinions comported with Plaintiff's statements about needing to lay down after taking her medication and how the severity of her pain affected her ability to concentrate and sometimes prevented her from getting out of bed for the entire day. (R. at 6, 9, 555-57, 882-87.)[5] But the Appeals Council relied on *objective* medical findings, including clinical findings showing that Plaintiff walked with a normal gait and displayed normal ankle strength, to discount those opinions. (R. at 5-6, 9.) Because the Appeals Council's opinion does not contain a sufficient explanation as to which subjective evidence it relied on in finding Plaintiff's statements regarding the intensity,

---

[5]     Specifically, Dr. Wishnie opined that Plaintiff would need to lay down during the workday due to drowsiness caused by her medication, and Dr. Laing opined that Plaintiff would miss more than three days of work per month due to her symptoms, and that her pain would frequently interfere with her ability to maintain concentration to perform simple tasks. (R. at 555-57, 882-87.)

persistence and limiting effects of her pain only partially credible, the Appeals Council erred in assessing Plaintiff's credibility.

### 1.   The Appeals Council's Lack of Explanation Does Not Constitute Harmless Error.

Defendant argues that the Appeals Council's faulty credibility assessment does not require remand, because both the Appeals Council and the ALJ adopted the same RFC; thus, even if the Appeals Council had found Plaintiff fully credible — as the ALJ did — it would not change the RFC assessment. (Def.'s Mem. 17-18.) Moreover, Defendant asserts that Plaintiff failed to identify any harm resulting from the Appeals Council's error. (Def.'s Mem. at 17-18.) Plaintiff argues that Defendant's reliance on the ALJ's and Appeals Council's identical RFC findings rests on the faulty premise that the RFC accounted for all of Plaintiff's substantiated limitations. (Pl.'s Reply at 1-3.) Plaintiff asserts that her testimony regarding the intensity of her pain supports the inclusion of additional RFC limitations reflecting that Plaintiff will be off task fifteen percent of the workday and will miss more than one day of work per month due to her severe pain. (Pl.'s Reply at 3-4.) Because the Appeals Council failed to properly assess Plaintiff's credibility and incorporate limitations accounting for Plaintiff's pain into the RFC, Plaintiff argues that the Court must remand the Appeals Council's decision. (Pl.'s Reply at 1-4.)

When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's error in the credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F. App'x 251, 252 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing a harmful error rests on "the party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different . .

32

. ." *Id.* At 411. Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether re-consideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

Here, the Court finds Defendant's reliance on the Appeals Council's and ALJ's identical RFC assessments misplaced, because that argument requires the Court to assume that the ALJ properly translated Plaintiff's subjective statements regarding the pain and intensity of her symptoms into appropriate RFC limitations and that substantial evidence supports the ALJ's ultimate RFC. The Court cannot engage in such an analysis, because the Appeals Council's decision constitutes the final decision of the Commissioner in this case, and the Court must decide whether the Appeals Council — not the ALJ — properly considered Plaintiff's credibility and crafted an RFC that reflected all of Plaintiff's substantiated limitations. *See Kellough v. Heckler*, 785 F.2d 1147, 1151 (4th Cir. 1986) ("[I]t is the Secretary's final decision rather than that of any initial decisionmaker that should be the direct object of judicial review.").

Against this standard, the Court finds a substantial likelihood that the Appeals Council's insufficient credibility assessment prejudiced Plaintiff, requiring remand. Ultimately, the Appeals Council's opinion makes it unclear whether the Appeals Council solely (and improperly) relied on objective medical evidence in finding Plaintiff's statements only partially credible, §§ 404.1529(c)(2), 416.929(c)(2); and, if not, what statements the Appeals Council found inconsistent with Plaintiff's testimony regarding the intensity of her pain, *Lewis*, 856 F.3d at 866. Although "subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof," this is not a case where the record stands devoid of objective medical evidence showing that Plaintiff's impairments could cause her pain. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citations and quotations omitted). Indeed, the Appeals

Council found at step one of the two-step credibility analysis that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. SSR 16-3p; (R. at 9.) Because Plaintiff met her "threshold obligation of showing through objective medical evidence" that her medically determinable impairments reasonably could be expected to cause her pain, she "was entitled to rely exclusively on subjective evidence" to prove that the continuous nature and severity of her pain prevented her from completing a full workday. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); SSR 16-3p; (R. at 9). If the Appeals Council relied solely on objective medical evidence in finding Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms only partially credible, it held Plaintiff to an improper standard and increased her burden of proof. *Lewis*, 856 F.3d at 866. And if the Appeals Council did not rely solely on objective evidence, on remand, the Appeals Council must explain which statements undercut Plaintiff's testimony. *Id.*

The Appeals Council's ambiguous credibility assessment further prevents the Court from determining whether the Appeals Council properly considered the extent to which Plaintiff's pain affected her capacity to perform basic work activities and incorporated those limitations into the RFC assessment. *Id.* (citing SSR 96-8p (explaining that the RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence (e.g., daily activities, observations)"). Because the Appeals Council's credibility assessment requires the Court to "speculate as to how the [Appeals Council] applied the law to its findings [and] . . . hypothesize the [Appeals Council's] justifications that would perhaps find support in the record," the Appeals Council's lack of explanation does not constitute harmless error, and the Court must remand. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

34

C.     **The Appeals Council's Flawed Credibility Assessment Precludes the Court from Determining Whether the Appeals Council Relied on a Complete Hypothetical.**

Finally, Plaintiff argues that the Appeals Council's decision requires remand, because the hypothetical that it relied upon to find that Plaintiff could perform her past relevant work did not account for all of her substantiated limitations. (Pl.'s Mem. at 14-15; Pl.'s Reply at 1-4.) Defendant responds that the hypothetical and corresponding RFC accurately reflected all of Plaintiff's substantiated limitations; thus, the Appeals Council properly relied on the VE's response to the hypothetical in concluding that Plaintiff could perform her past relevant work. (Def.'s Mem. at 24-25.)

At step four of the sequential analysis, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant is able to perform the tasks of her previous employment. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The regulations provide that the ALJ may use the services of a VE or look to the *Dictionary of Occupational Titles* when determining the demands of a claimant's past relevant work. §§ 404.1560(b)(2), 416.960(b)(2). During the administrative hearing, the ALJ must also pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about whether the claimant's RFC allows her to perform her past relevant work. §§ 404.1560(b)(2), 416.960(b)(2); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE prove "relevant or helpful." *Walker*, 889 F.2d at 50.

Plaintiff asserts that the hypothetical on which the Appeals Council relied to determine that Plaintiff could perform her past relevant work failed to include the limitations assessed by Dr. Wishnie in his opinion, as well as limitations accounting for Plaintiff's ability to stay on task

and maintain regular attendance due to her severe pain. (Pl.'s Mem. at 14-15; Pl.'s Reply at 3-4.)
By challenging the completeness of the hypothetical, Plaintiff challenges completeness of the
RFC. As explained above, the Appeals Council's flawed credibility assessment precludes the
Court from determining whether the Appeals Council properly accounted for the "partially"
credible aspects of Plaintiff's testimony regarding the intensity, persistence and limiting effects
of her symptoms in the RFC.[6] Thus, the Court cannot determine the completeness of Plaintiff's
RFC and must remand for further consideration.

## VI.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for
Summary Judgment (ECF No. 13) be GRANTED, that Defendant's Motion for Summary
Judgment (ECF No. 14) be DENIED and that the final decision of the Commissioner be
VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Let the clerk forward a copy of this Report and Recommendation to United States District
Judge M. Hannah Lauck and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**
**recommendations of the Magistrate Judge contained in the foregoing report within**
**fourteen (14) days after being served with a copy of this report may result in the waiver of**

---

[6]    Although the Court finds that substantial evidence supports the assignment of limited weight to Dr. Wishnie's opinion, the Court cannot assess whether the Appeals Council erred in excluding all of the limitations that Dr. Wishnie assessed from the RFC, as those limitations coincide with Plaintiff's testimony regarding the pain, intensity and limiting effects of her symptoms. For instance, Dr. Wishnie opined that Plaintiff will need to lay down during the day, because her medications cause her to feel drowsy. (R. at 884.) This limitation aligns with Plaintiff's testimony regarding the side effects of her medication. (R. at 34-35.)

any right to a de novo review of the determinations contained in the report and such failure

by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: July 31, 2019

37